United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNMATCH, INC., <br><br> Plaintiff, <br><br> v. <br><br> NXTBIGTHING, LLC, et al., <br><br> Defendants. | Case No.  14-cv-05438-JST <br><br> **ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR TERMINATING SANCTIONS FOR SPOLIATION OF EVIDENCE** <br><br> Re: ECF No. 63 |

In this trademark dispute, Plaintiff InternMatch, Inc. alleges that Defendants Nxtbigthing, LLC and Chad Batterman fraudulently obtained registration of the trademark "INTERNMATCH" and seek cancellation of the mark.  ECF No. 1.  On November 12, 2015, InternMatch filed a Motion for Terminating Sanctions for Spoliation of Evidence, ECF No. 63, which the Court now considers.

## I.     BACKGROUND[1]

### A.     Trademark Registration

Founded in 2009, InternMatch provides online resources and tools to connect students seeking internships with employers seeking interns.  ECF No. 1 ¶ 10.  InternMatch offers these resources and tools under the name "INTERNMATCH."  Id.  The company started a trademark application with the U.S. Patent and Trademark Office (USPTO) in 2009 but abandoned the application by July 7, 2010.  Id. ¶¶ 18–19.  The application described the following services:

> Employment agency services, namely, providing a website with online video, audio and textual information to support recruiting, employment branding, and general candidate evaluation; recruiting services for filling corporate internship positions; providing an online searchable database featuring employment opportunities and

---

[1] Unless stated otherwise, the following background facts are taken from the allegations of the Complaint.

content about employment.

Id. ¶ 20.  InternMatch filed a new trademark application in January of 2014, but the application was suspended because of an application for the same mark filed by defendant Nxtbigthing.  Id. ¶¶ 21, 27.

Nxtbigthing is a limited liability company owned by Chad Batterman.  ECF No. 32 ¶ 2. Chad Batterman first began using the mark INTERNMATCH as a trademark for his job searching services in 2007.  Id. ¶ 8.  In 2012, Batterman formed Nxtbigthing, LLC to operate the business. On March 27, 2013, Nxtbigthing filed an intent-to-use trademark application for INTERNMATCH, and the application issued on November 18, 2014.  ECF No. 1 ¶ 22; ECF No. 32 ¶ 22.  The application described the following services:

> Online computer services, namely, providing a website that offers the exchange of information in the field of employment opportunities and career placement, recruitment, careers, and job listings, providing an on-line searchable database featuring classified ad listings and employment opportunities, career networking services, providing a web site featuring the ratings, reviews and recommendations on employers and employees and places of employment for use by employees, employers, business owners, and consumers.

ECF No. 1 ¶ 22.  In its statement of use, Nxtbigthing states that the trademark was first used in commerce on February 15, 2007.  ECF No. 1 ¶ 23.

On January 15, 2014, InternMatch sent Batterman a letter, informing him of InternMatch's "prior rights in the INTERNMATCH trademark."  Id. ¶ 28.  Batterman responded by offering to settle the INTERNMATCH matter for $325,000.  Id. ¶ 29.  Batterman also provided documents to InternMatch, demonstrating use of the INTERNMATCH trademark as early as 2007.  Id.  The documents included marketing flyers and an activity log.  Id. ¶ 30; see id. ¶¶ 31–34 (providing copies of the documents sent to InternMatch).  InternMatch did not accept Batterman's offer to sell his rights in the trademark.  InternMatch alleges that Defendants subsequently issued trademark claim notices to various social networking services used by InternMatch.  Id. ¶ 45.

**B.      Underlying Litigation**

InternMatch filed its complaint on December 12, 2014.  See ECF No. 1.  In it, InternMatch alleges five causes of action: (1) false designation of origin; (2) cancellation for fraud on the

United States District Court
Northern District of California

2

USPTO; (3) cancellation for lack of use in commerce; (4) declaratory judgment that InternMatch has superior rights to Nxtbigthing and Chad Batterman in the INTERNMATCH trademark; and (5) unfair competition under California's Business and Professions Code section 17200. Id. InternMatch alleges that "Nxtbigthing and Mr. Batterman currently hold or control various trademark registrations and/or trademark applications that have been or are being prosecuted through the use of false specimens of use at the USPTO." Id. ¶ 39. InternMatch argues that central to these claims is a determination of whether InternMatch or Nxtbigthing has priority in the INTERNMATCH trademark and whether Batterman created and provided genuine evidence of use documents. ECF No. 63 at 11.

Defendants Nxtbigthing and Chad Batterman answered the Complaint on February 25, 2015. See ECF Nos. 31, 32. Nxtbigthing also filed counterclaims alleging (1) trademark infringement, (2) unfair competition under the Lanham Act; and (3) unfair competition under California's Business and Professions Code section 17200.[2] See ECF No. 32. Defendants' Answer states that "[f]rom 2007 through current day, Mr. Batterman and Nxtbigthing have continuously and extensively used the mark INTERNMATCH® in interstate commerce." ECF No. 32 ¶ 14.

On May 6, 2015, the parties submitted a joint case management statement and identified the principal factual issues in dispute:

> Whether the evidence of commercial use of the INTERNMATCH trademark by Defendants are genuine and whether statements made by Defendants in order to procure its INTERNMATCH trademark registration are fraudulent, such that Defendants do not own any rights to the trademark INTERNMATCH. Additionally, the parties dispute whether Plaintiff is an infringer of the INTERNMATCH trademark.

ECF No. 49 at 3. The parties' joint case management statement also stated that the parties' had taken reasonable steps "to preserve evidence relevant to the issues reasonably evidence in this action." Id. at 4.

---

[2] On December 25, 2015, Nxtbigthing filed a motion to voluntarily dismiss its counterclaims. ECF No. 83. The Court addresses that motion in a separate order.

United States District Court
Northern District of California

United States District Court
Northern District of California

### C.     Loss of Evidence

In discovery, InternMatch sought copies, including electronic copies, of documents that would support Nxtbigthing and Batterman's assertions that they have used the InternMatch mark "continuously and extensively."[3]  In response to InternMatch's requests for production, Nxtbigthing informed InternMatch that electronic copies of potentially responsive documents "were irretrievably lost in August 2011 due to a lightning strike, and in April 2015 due to a power surge."  See ECF No. 65-1, Keyes Decl., Ex. 7.

InternMatch asked Batterman about these assertions at his deposition.  He testified that Nxtbigthing created a database in 2007 or 2008 that permitted users to search for job postings. ECF No. 64-1, Keyes Decl., Ex. 1, Batterman Tr. 62:12–23.  The database was maintained on hard drives.  See id. at 62:24–64:10.  Two separate lightning strikes hit Batterman's office in August and September or October of 2011.  Id. at 75:1–14.  Batterman testified that, as a result of the August 2011 lightning strike, the data on the hard drives were not recoverable.  Id.  Batterman purchased a replacement iMac desktop computer in August or September of 2011.  Id. at 96:14–22.  Batterman transferred documents evidencing his use of the INTERNMATCH mark to the desktop computer through a backup jump drive on which Batterman had stored past marketing and advertising materials and financial information.  Id. at 130:16–132:7.  Batterman testified that he was able to reconstruct a new database because many of the job postings existed in paper form. Id. at 77:17–78:3.

Defendants allege that a power surge destroyed the iMac desktop computer and other electronic devices on April 2, 2015, while this litigation was pending.[4]  Sometime between April 5, 2015 and April 12, 2015, various electronic devices, including the iMac desktop computer that contained corporate records and marketing material central to the parties' dispute, were discarded. Defendants did not run diagnostics on the iMac desktop computer to see if the files on the hard

---

[3] The parties have submitted the discovery responses, but not the original requests.

[4] Correspondence between Batterman and his insurer notes that Batterman initially reported that the power surge occurred on April 2, 2015.  See ECF No. 65-5, Keyes Decl., Ex. 11.

drive could be recovered prior to discarding it.  ECF No. 64-1, Keyes Decl., Ex. 1, Batterman Tr. 19:9–18, 20:5–25.  The desktop computer contained the only electric copies of Nxbigthing's marketing materials that allegedly established prior use.  ECF No. 63 at 15.

On November 12, 2015, InternMatch filed the present motion for terminating sanctions, accusing Defendants of intentionally destroying the electronic versions of the evidence of use documents.  ECF No. 63.  Nxtbigthing and Chad Batterman filed a response on December 1, 2015.[5]  ECF No. 72.  InternMatch filed a reply on December 4, 2015.  ECF No. 77.  The Court heard argument on December 17, 2015.  ECF No. 82.

## II.      JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1338 and 28 U.S.C. § 1331.

## III.     LEGAL STANDARD

Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  United States v. Kitsap Physicians Svs., 314 F.3d 995, 1001 (9th Cir. 2002).  A party must "suspend any existing policies related to deleting or destroying files and preserve all relevant documents related to the litigation."  In re Napster, Inc. Copyright Litig., 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006) (citation omitted).

The court's authority to sanction a party for despoiling evidence derives from two sources: "the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who 'fails to obey an order to provide or permit discovery.'"  Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006) (quoting Fed. R. Civ. P. 37(b)(2)).  The court may make factual findings in relation to a motion for sanctions based on the spoliation of evidence.  Id.  "A court may sanction spoliation by: imposing monetary sanctions; instructing the jury to draw an adverse inference against the despoiling party; excluding testimony based on despoiled evidence proffered by the despoiling party; or, if willfulness is found, entering default judgment against the despoiling party."  Columbia Pictures,

---

[5] Defendants' response was untimely.

United States District Court
Northern District of California

Inc. v. Bunnell, No. 2:06CV01093 FMC–JCX, 2007 WL 4877701, at *4 (C.D. Cal. Dec. 13, 2007).

Rule 37 of the Federal Rules of Civil Procedure was recently amended, and now provides as follows:

> (e) Failure to Preserve Electronically Stored Information.  If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>>
>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>>
>>> (A) presume that the lost information was unfavorable to the party;
>>>
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>>
>>> (C) dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e).  Any remedy applied to a spoliator "should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been absent the wrongful destruction of evidence by the opposing party.'"  Apple Inc. v. Samsung Elecs. Co., 881 F. Supp. 2d 1132, 1136 (N.D. Cal. 2012) (internal quotation omitted).

"A terminating sanction, whether default judgment against a defendant or dismissal of a plaintiff's action, is very severe."  Connecticut General Life Ins. Co. v. New Images of Beverly Hills, 482 F.3d 1091, 1096 (9th Cir. 2007).  Entry of a default judgment is permitted when the disobedient party has "willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."  Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir. 1983).  A terminating sanction, however, may only issue if the violation or abuse is willful, in bad faith, or the fault of the party.  Id.  "Disobedient conduct not shown to be outside the control of the litigant is sufficient to demonstrate willfulness, bad faith, or fault."  Jorgensen v.

1   Cassiday, 320 F.3d 906, 912 (9th Cir. 2003) (quoting Hyde & Drath v. Baker, 24 F.3d 1162, 1166

2   (9th Cir. 1994)).

3       The Ninth Circuit identifies five factors a court must weigh in determining whether the

4   terminating sanction is justified:

> (1) the public's interest in expeditious resolution of litigation; (2)
> the court's need to manage its dockets; (3) the risk of prejudice to
> the party seeking sanctions; (4) the public policy favoring
> disposition of cases on their merits; and (5) the availability of less
> drastic sanctions.

8   Leon, 464 F.3d at 958.  Finally, "due process concerns further require that there exist a

9   relationship between the sanctioned party's misconduct and the matters in controversy such that

10  the transgression 'threaten[s] to interfere with the rightful decision of the case.'"  Anheuser-Busch,

11  Inc. v. Nat. Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995) (quoting Wyle v. R.J.

12  Reynolds Indus., Inc., 709 F.2d 585, 591 (9th Cir. 1983)).[6]

13  ## IV.   DISCUSSION

14      As part of the Court's inherent power, InternMatch requests that the Court grant default

15  judgment against Defendants on all of InternMatch's claims and dismiss with prejudice

16  Nxtbigthing's counterclaims.  Alternatively, InternMatch requests that the Court (1) give an

17  adverse inference jury instruction, informing the jury that Defendants destroyed evidence that

18  would have supported InternMatch's claims, and (2) preclude Defendants from offering testimony

19  or argument that the spoliated evidence supports (or would have supported) Defendants'

20  allegations that they have priority to the trademark.  InternMatch also requests that the Court

21  impose monetary sanctions against Defendants.  See ECF No. 63.

---

[6] Different courts have applied different tests in determining the appropriate sanction for the
spoliation of electronic evidence.  The recent amendments to Rule 37 were "designed to provide a
uniform standard in federal court for use of these serious measures when addressing failure to
preserve electronically stored information."  Advisory Committee Notes, FED. R. CIV. P. 37.
Whether a district court must now make the findings set forth in Rule 37 before exercising its
inherent authority to impose sanctions for the spoliation of electronic evidence has not been
decided.  Here, the Court determines both that the Defendants' conduct was willful and in bad
faith, and that defendants "acted with the intent to deprive another party of the information's use
in the litigation."  FED. R. CIV. P. 37(e)(2).  Accordingly, it need not resolve the question of the
relationship of the recent amendments to the existing case law.

United States District Court
Northern District of California

### A.      Duty to Preserve Relevant Evidence

Defendants were under a duty to preserve documents that showed their prior use of the disputed mark.  "As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action."  In re Napster, 462 F. Supp. 2d at 1067.  Shortly after litigation commenced, "previous lead counsel"[7] instructed Batterman to print out a sample of relevant records, including Nxtbigthing's marketing fliers, and screenshots of the properties of some of the files, showing the file's size, local path location, creation date, and last-modified date.  Batterman Decl. ¶ 5.  Batterman states that about 100 pages were printed out.  ECF No. 64-1, Keyes Decl., Ex. 1, Batterman Tr. 19:24–20:4.  These documents purportedly showed Nxtbigthings evidence of prior use of the disputed mark.

The documents on the discarded iMac desktop computer assertedly included electronic versions of Defendants' evidence of use documents.  These documents were unarguably relevant to Defendants' claims in the litigation, as well as to InternMatch's assertion that "Defendants fabricated documents to show their 'use' of the InternMatch mark."  ECF No. 63 at 8.

InternMatch argues that Defendants were clearly on notice of their duty to preserve evidence no later than the date that both Defendants were served with the Complaint in January 2015.  ECF No. 63 at 21.  That duty extended to historical and electronic versions of the documents showing Defendants' prior use of the mark, because the Complaint alleges that those documents are not genuine.  ECF No. 1 ¶¶ 30, 32–35.  The Court finds that at least by January 2015, Defendants knew about the present action and were under a duty to preserve relevant evidence.

The evidence shows that Defendants violated this duty.  Batterman testified that the only electronic versions of the evidence of use documents were on the iMac desktop which was discarded months after litigation began.  ECF No. 64-1, Keyes Decl., Ex. 1, Batterman Tr. 19:19–

_____

[7] Defendants were previously represented by Andrew Serros at Schinner and Shain, LLP and Jill Browning and Jeffrey Handelsman of Greenblum & Bernstein, P.L.C.  See ECF No. 37.  On March 6, 2015, Browning and Handelsman moved to withdraw as counsel of record.  Id.  On March 19, 2015, notice of substitution of counsel was provided noting that Quinn Chevalier of Schinner & Shain, LLP would be the substituted counsel of record for Defendants.  ECF No. 41.

20:4.  At his deposition, Batterman testified that he could not recall whether he or his wife, Silvia

Santo, discarded that particular computer, id. at 19:3–10, but he later submitted a declaration

averring that his wife discarded it.  ECF No. 73, Batterman Decl. ¶ 24 ("The devices that my wife

disposed of contained all of NXT's electronically stored information and data, including all

electronic copies of NXT's marketing materials that are the subject of this litigation.").  Santo also

declared that she discarded the iMac desktop.  ECF No. 74, Santo Decl. ¶ 7.

Prior to discarding the desktop, Batterman did not make any effort to determine whether

the hard drive on the desktop was salvageable or any data could be recovered from it.  ECF No.

64-1, Keyes Decl., Ex. 1, Batterman Tr. 20:5–25.  As a result, the parties can only access the few

existing paper copies of the relevant documents, rather than the electronic files, which would

include valuable information such as the creation and modification history of the files.

Because the duty to preserve relevant evidence attached by January 2015, and Defendants

violated that duty, the Court must determine whether to impose sanctions, and if so, in what form.

As discussed below, the appropriate sanction depends on the culpability of the Defendants and the

resulting prejudice to InternMatch.  In re Napster, 462 F. Supp. 2d at 1070.

## B.    Spoliation of Evidence

InternMatch argues Defendants intentionally discarded devices that contained the

electronic versions of the evidence of use documents and that the April 2015 power surge alleged

by Defendants is implausible.  See ECF No. 63 at 8.  To support its contentions, InternMatch

compares Batterman's deposition testimony with statements made to his insurer and materials he

submitted to his insurer for his claim.

### 1.    Denial of Further Coverage on Batterman's Insurance Claim

After the alleged power surge, Batterman submitted claims to his homeowner's insurance

carrier, Homesite Home Insurance, and to his business insurance carrier, The Hartford.  ECF No.

73, Batterman Decl. ¶ 18.  Batterman states that "[b]oth investigations concluded that the power

surge happened, and both insurance carriers paid out on the claims."  Id. ¶ 20.  Homesite did pay

out nearly $19,000, but part of Batterman's claim "was denied because they said that some of the

affected equipment was used for business purposes, and thus not covered by [his] homeowner's

policy." Id. ¶ 15.  Batterman asserts that his insurance carrier has never accused him of committing fraud.  Id. ¶ 16.

Records subpoenaed from Batterman's homeowner's insurance carrier, however, do not support his contentions.  While the insurance carrier paid out roughly $18,000 in two installments, the carrier denied further coverage of the claim.[8]  In fact, after conducting an investigation of Batterman's claims, Homesite denied coverage, citing "concealment or fraud" as the reason for the exclusion.  See ECF No. 65-5, Ex. 11; ECF No. 65-6, Ex. 12.

In a letter dated June 26, 2015, Homesite noted a number of inconsistencies with statements made throughout the claims process "which supports that misrepresentation of material facts of the loss has occurred."  ECF No. 65-5, Ex. 11.  The insurer noted the following issues:

- On March 25, 2015, Batterman called to ask about coverage for damages due to a power surge but stated there were no damages at the time.  On April 4, 2015, Batterman filed a claim for a power surge that occurred on April 2, 2015.

- Batterman initially claimed he heard a loud noise due to a power surge that blew the breaker and damaged the devices.  In a subsequent statement made to a field investigator, Batterman stated that he was out running errands and not at home when the surge occurred.

- Homesite instructed Batterman that he would need to run a diagnostic report on the items but he stated that he could not wait that long.  In a subsequent statement to the field investigator, Batterman stated that an electrician ran diagnostics on all of the damaged items.  Batterman stated he could not take the computers to have diagnostics performed because he did not own a vehicle.  However, Santo revealed to the field investigator that Batterman used a vehicle to dispose of the electronics.

- On April 10, 2015, Batterman informed the insurer that he still had items that were damaged.  The insurer instructed Batterman on the salvage process, but Batterman expressed concern about sensitive data that would be turned over to the insurer.  On April 14, 2015, the salvage adjuster called regarding the items but Batterman informed the adjuster that all items were thrown out and that the insurer did not inform him about the salvage process.

Id.

The insurer followed up on July 24, 2015, to respond to Batterman's inquiries regarding

---

[8] InternMatch points out that the insurer's denial letters came only weeks before Batterman's deposition.  Yet at his deposition, Batterman insisted that his claims were properly paid out.  See, e.g., ECF No. 64-4, Ex. 4, Batterman Tr. 231:21–242:3.

United States District Court
Northern District of California

the denial letter.  The insurer reiterated the inconsistencies cited above, and also raised additional

concerns:

- The insurer suggested that Batterman take the items to Best Buy for diagnostics and he insisted that he would not do that because of proprietary information on his computers and because he lacked a vehicle.  However, in Batterman's July 15, 2015 email, he denies saying that he wouldn't take the items to Best Buy and that Best Buy does not offer diagnostics testing.

- Batterman's email noted that the electrician made two visits: one to inspect the outlets and another to inspect the computer equipment and run diagnostics.  The insurer only received "a generic invoice dated 4/7/15" regarding the first visit.  The insurer never received the diagnostics report or invoice from the second visit.  In a subsequent conversation with the field investigator, the electrician stated he changed four outlets and looked at a computer and printer.

- The insurer instructed Batterman to obtain diagnostics on all damaged items; however, Batterman did not comply and discarded the computers.  The insurer noted their initial payment "was made in good faith" without Batterman having completed the requested diagnostics.

- The receipts for electronics submitted by Batterman show redactions or alterations.  One invoice shipped items to a business called Diamond Ridge Camps.  Batterman stated he had never worked there, but the insurer's investigations identified that he had previously been an employee there.

- Both the power company and the property manager had zero reports of surge-related activity.

ECF No. 65-6, Ex. 12.  This letter again identified "concealment or fraud" as the policy exclusion.

Id.

On August 7, 2015, the insurer again confirmed that it would deny the remaining portions

of the claim.  ECF No. 66-1, Ex. 13.

Internal records from the insurer also show that upon subsequent investigation into

Batterman's claim, the insurer declined paying further on the claim due to misrepresentation.  ECF

No. 66-2, Ex. 14.  The records also detail Batterman's correspondence with the insurer, in which

stated that he did not agree to release of the details of the claim if the insurer was subpoenaed.[9]

---

[9] Defendants point out that that Batterman's business insurance policy has released $5,000 to assist in the replacement of the items in the power surge.  ECF No. 72 at 8; ECF No. 73-1, Batterman Decl., Ex. A.  Beyond a confirmatory email from the insurance company, Batterman has not submitted additional information regarding that claim.

United States District Court
Northern District of California

1   See id.

2   ## 2.   Implausibility of the Power Surge

3         On March 25, 2015, Batterman called Homesite Home Insurance, his insurance carrier, to

4   inquire about how a power surge claim would be handled.[10]  See ECF No. 65-5, Ex. 11; ECF No.

5   65-6, Ex. 12.  Batterman had no damage to report at that time.  Id.  Ten days later, on April 4,

6   2015, Batterman filed a claim, alleging that on April 2, 2015 – a mere eight days after his call

7   asking about power surge claims – his apartment experienced a power surge that irreparably

8   damaged several electronic devices in his home office.  See id.  Batterman claims that all

9   electronic devices plugged into affected outlets were "fried," including: "two iMac desktops, at

10  least one MacBook laptop, a printer, a Pogo plug, and two or three external hard drives."  ECF No.

11  73, Batterman Decl. ¶ 10.  InternMatch contends that this chronology of events demonstrates that

12  Defendants fabricated the power surge story.  ECF No. 63 at 17.

13        According to Defendants, the power surge affected four to six electrical outlets and the

14  electronic devices in one part of the home office of their apartment, but the rest of the apartment

15  had electricity.  See, e.g., ECF No. 64-6, Keyes Decl., Ex. 6, Santo Tr. 89:13–17.  Batterman

16  never notified the landlord or property manager of the surge.  Id., Ex. 3, Batterman Tr. 179:15–18;

17  Ex. 4, Batterman Tr. 284:22–23.  A separate insurance coverage letter from Homesite Home

18  Insurance, detailing why the additional coverage was denied, noted that its field investigator

19  concluded that no reports of any surge related activity were made to the power company and the

20  property manager during the time of the alleged power surge.  ECF No. 65-12, Keyes Decl., Ex.

21  12.  InternMatch's electrical engineering expert, Joseph Greco, also reports that there was no

22  evidence of lightning occurring in the area during the time period of the alleged power surge.  ECF

23  No. 70-1, Ex. 1 at 7.  The expert also concluded that a scenario where only four or five electrical

24  outlets were affected is "highly unlikely."  Id. at 6.

25  _____

26  [10] Batterman states he was motivated to inquire about his policy because "stormy weather" in
    March 2015 reminded him of a prior lightning strike and the effect it had on his equipment.  ECF
27  No. 63 ¶ 8.  This prompted him to call this carrier to find out the scope of coverage for lightning
    strikes and power surges.  Id.  Batterman testified that in 2011, lightning actually struck the same
28  place twice – in August of 2011, destroying all hard drives, and September or October of 2011,
    destroying his firewall.  ECF No. 64-1, Ex. 1, Batterman Tr. 75:1–9.

United States District Court
Northern District of California

Defendants offer an expert rebuttal from Dr. John Tobias.  See ECF No. 75, Exs. A-C. Tobias states that many transient power outages are caused by internal sources within a facility. See id., Ex. B at 4.   Tobias also opines that "situations" within a residence can cause a transient power outage to only one branch circuit, and that Greco's report did not rule out that possibility as a cause of the damage in this case.  Id. at 5.  Finally, Tobias places emphasis on the testimony of the electrician, Stephen Crooks, who came to inspect and replace the electrical outlets after the alleged power surge.  Tobias notes that "Mr. Crooks' opinion that the receptacles and equipment listed in his statement were damaged by 'surge' or overcurrent needs consideration, as the only third party and person with electrical training that is known to have observed the physical evidence consisting of the damaged equipment."  Id. at 6.

The Court need not weigh the competing opinions of the parties' experts.  Batterman's story about the power outage simply is not plausible.  His phone call to his insurance carrier a mere eight days before the alleged power surge was not a coincidence.  The inconsistencies within his insurance claims, and between his deposition testimony and his filed claims, strengthen the conclusion that Batterman fabricated his account regarding the power surge.

### 3.    Batterman's Representations about the Electrician

As part of the materials submitted to verify his insurance claim, Batterman included an invoice from an electrician named Steve Crooks.[11]  ECF No. 66-3, Ex. 15.  The invoice generically states that it is an "Electrical Work Order" and does not identify the company providing the services.  See id.  The invoice charges $300 for an outlet voltage test and replacement of four outlets.[12]  Id.  When asked at his deposition about the name of the electrician, Batterman repeatedly testified that he could not recall the name of his electrician:

Q. Okay. And I believe you testified that you, you weren't the one

---

[11] InternMatch notes that this invoice was not produced by Defendants, but rather obtained as a result of InternMatch's subpoena to the insurance carrier.  InternMatch received this information after depositions of both Batterman and Crooks concluded.  See ECF No. 77 at 4 n.5.

[12] Batterman also reported to his insurer that an electrician performed work twice: the first time, to replace the outlets and conduct a volt test and the second time, to run diagnostics on his electronic devices.  Batterman did not produce any evidence to substantiate the second visit.  See ECF No. 65-5, Ex. 11; ECF No. 65-6, Ex. 12.

13

responsible for contacting the electrician to have the outlets changed, right?

A. No, I didn't say that. I said I didn't recall the name of the electrician that came out.

Q. You what?

A. I said I didn't recall the name of the electrician that came out to change the outlets.

Q. Okay. So sorry if I misunderstood that, so did you, did you personally place a call to the electrician to have the electrician come and –

A. I did. I did.

…

Q. Hold on. Do you have any records of who the electrician was that came to the, that came to the apartment to switch out the outlets?

A. I will check.

ECF No. 64-3, Ex. 3, Batterman Tr. 177:17–178:18.

Q. Okay. How did you get the name of the electrician, if you recall?

A. Doing previous work at my, doing work at my previous job.

Q. You recall -- I don't get it, you recalled the name of this individual from your previous job?

A. I looked it up.

Q. Where did you look it up?

A. I believe notes from my old position.

Q. Notes from your old position?

A. Contact information, yes.

Q. Notes from your old position U.S. Rec?

A. Yes.

Q. Okay. And do you still have those notes?

A. No, I looked him up and I found what I needed and I discarded them.

…

Q. So you've used this electrician on at least two occasions then?

A. Yes.

Q. And you don't remember the name of the company?

A. I do not. Not offhand.

Q. And you don't remember the name of the individual?

A. No. I'll have to check my records.

Id. at 180:3–22; 182:10–17.

On a separate day of his deposition, Batterman again affirmed that he could not recall the

14

name of the electrician, Steve Crooks:

> Q. How did you find his number?
>
> A. I told you on Tuesday. I went to my previous job and I found his number there, and then I contacted him. And he made arrangements to come and swap the receptacles out and test for the electrical disturbance.
>
> Q. And you -- you don't -- I can't remember, do you remember his first name and you don't remember his last name?
>
> A. Not off the top of my head, I don't.
>
> Q. You don't remember either the first or last name?
>
> A. I don't remember who the electrician was right now.
>
> Q. Okay. And you don't remember what company he was with?
>
> A. I don't. I don't think -- I don't know if he was with a company or by himself.

ECF No. 64-4, Ex. 4, Batterman Tr. 298:17–299:12.

When the insurance carrier's field investigator contacted Crooks, as part of its investigation into the claim, Crooks stated that a friend had referred him, but when asked the friend's name, he said that he did not know.  ECF No. 66-2, Ex. 14.

Batterman's repeated, emphatic lack of recollection as to Crooks' identity, as the electrician who made these repairs, strains belief.  At Crooks' deposition, Crooks testified that he has known Batterman for several years and has assisted Batterman with passing out flyers on 18 to 24 separate occasions.  ECF No. 64-5. Ex. 5, Crooks Tr. 20:12–23, 35:10–23.  As part of their Rule 26(a)(1) initial disclosures, Defendants identified Stephen Crooks, an electrical engineer with SEPTA, as a person "likely to have knowledge of issues related to the use of the trademark InternMatch since 2007."  ECF No. 65-2, Ex. 8.  Defendants stated that Crooks used the job service "for years" and also distributed marketing materials for Nxtbigthing "for years."  Id. Batterman explicitly discussed Crooks as an individual who helped promote the trademark.  See ECF No. 64-1, Ex. 1, Batterman Tr. 54:5–21, 56:21–24, 153:7–17, 154:9–14.

The Court can only conclude that either Batterman lied under oath when he stated he could not recall the name of his electrician or lied when submitting the invoice for electrical repairs to his insurer.  In either event, Batterman's duplicitous statements regarding Crooks further support the conclusion that Batterman's power surge story is a fabrication.

#### 4.      Discarded Devices

Batterman and Santo testified that after the power surge, they tried to turn on the affected devices, but none would power up.  ECF No. 73, Batterman Decl. ¶ 21; ECF No. 74, Santo Decl. ¶ 4.  After this discovery, however, Batterman never took the devices to a technician to run diagnostics on the affected devices in order to determine whether the devices or data on the devices could be salvaged.  At his deposition, Batterman confirmed that he did not try to salvage the iMac desktop:

> Q. So you discarded the October 2011 desktop?
>
> A. Along with some other electronics, yes.
>
> Q. We'll get to those. But who was the one that actually discarded the October 2011 desktop Mac. Was that you?
>
> A. I don't recall. It was myself or my wife, because I believe she discarded a few items and I discarded a few items.
>
> Q. What did you do, just throw it in the garbage?
>
> A. Yeah.
>
> Q. Did you try to salvage it or safe the hard drive?
>
> A. No, mostly because the smell. It was smell like a burnt after keeping it in our apartment for a few days, it just permeated the apartment and it was unbearable so that's why -- that's the main -- really the main reason why it was discarded. Other than that, we would have kept it.
>
> Q. So the October 2011 desktop Mac, it had corporate records on it, right?
>
> A. Um, I believe so. Yeah, I believe so.
>
> Q. You would have had copies of NextBigThing marketing and advertising collateral?
>
> A. Correct. But I also printed everything out in preparation of Greenblum & Bernstein advised me to do.

ECF No. 64-1, Keyes Decl., Ex. 1 Batterman Tr. 19:1–25.  Although his home insurance company suggested that he take the computers to Best Buy to run diagnostics, Batterman stated that Best Buy informed him they could not offer technical services in connection with insurance claims.  Batterman Decl. ¶ 21.  Batterman did not seek out other services.

Batterman and Santo noted that the affected devices emitted a "strong, foul odor of burnt plastic and electronics."  ECF No. 72 at 9; Batterman Decl. ¶ 23; Santo Decl. ¶ 6.  Defendants argue that because the odor caused nausea, Santo discarded the affected electronic devices,

including the iMac desktop and two or three external hard drives.  ECF No. 72 at 10.  These specific devices "contained all of [Nxtbigthing]'s electronically stored information and data, including all electronic copies of [Nxtbigthing]'s marketing materials that are the subject of this litigation."  Id.; Batterman Decl. ¶ 24.  Coincidentally, Santos discarded all of the devices used by Nxtbigthing and Batterman discarded all of the devices used personally.  See id.; Batterman Decl. ¶ 27.

In opposing the present motion, Defendants primarily argue that although the electronic devices were discarded after litigation began, they were not discarded *by Defendants*, and so Defendants bear no responsibility for the loss of evidence.  According to them, all of the relevant electronic devices were discarded by Santo, "and she did so of her own accord without notifying Defendants in advance."  ECF No. 72 at 12.  Defendants stress that Santo, with heightened olfactory sensitivities from her pregnancy, had no option *but* to discard the devices.  Batterman and Santo had no alternative storage space and Santo was unaware of the "need to safeguard any potentially relevant evidence for this litigation."  Id. at 10.

The Court does not find it credible that *even if* the power surge occurred and *even if* the power surge damaged the electronic devices, Santo discarded only the electronic devices used by Nxtbigthing, and Batterman discarded only his personal electronic devices purely by happenstance – or that such a division of effort occurred at all.

Finally, even if the Court accepted this strained version of events in its entirety (and it does not), Nxtbigthing would still be culpable for spoliation, because Defendants would still have failed in their obligation to ensure that relevant evidence be preserved.  For example, Santo was apparently never informed about the parameters of the lawsuit against Batterman and Nxtbigthing, or her duty to preserve evidence, see ECF No. 73, Batterman Decl. ¶ 25; ECF No. 74, Santo Decl. 9, even though she is a contributor to Nxtbigthing and was identified in Defendants' initial disclosures as an individual with discoverable information:

> This person is likely to have knowledge of issues related to the use of Defendants' trademark InternMatch since 2007. Ms. Santo has used Defendants' service over the years to search for job availability, and has traveled the country assisting in the marketing of Defendants' business. Ms. Santo has assisted in the graphic

17

1    designs of marketing materials.  Ms. Santo's relationship began in
     Pennsylvania.

2    ECF No. 65-2, Ex. 8.  In light of Santo's role at Nxtbigthing, Defendants failed to meet their

3    discovery obligations by failing to communicate their discovery obligations to her.  See Nat'l

4    Ass'n of Radiation Survivors v. Turnage, 115 F.R.D. 543, 557–58 (N.D. Cal. 1987) ("The

5    obligation to retain discoverable materials is an affirmative one; it requires that the agency or

6    corporate officers having notice of discovery obligations communicate those obligations to

7    employees in possession of discoverable materials.").   Defendants also failed to take any steps to

8    safeguard relevant evidence once the alleged power surge occurred, having never verified whether

9    data from the affected devices could be retrieved and preserved.  InternMatch's expert, Christian

10   Hicks, stated that even if a computer had been damaged by a power surge, it is possible for a

11   technician "to remove the storage medium and connect it to a working computer."  ECF No. 67-5,

12   Ex. 23.  If the data is intact, a technician could then copy the data onto a new storage device.  Id.

13   Batterman did not explore this process.

14          The Court finds that at the very least, Defendants consciously disregarded their obligations

15   to preserve relevant evidence.  There is no evidence that Defendants took any steps to preserve

16   relevant information after the litigation began.  They did not communicate their evidence

17   preservation obligations to Santo, even though she performed marketing and does graphic design

18   tasks for Nxtbigthing and has access to Nxtbigthing's electronic devices.  After the alleged power

19   surge, Defendants failed to identify whether data from the electronic devices might be recoverable,

20   and instead simply discarded the devices.

21          The Court also finds Defendants' evidence that the surge occurred in the first place to be

22   unbelievable.  Not only is the alleged chronology of events highly improbable, but Defendants'

23   story is filled with inconsistencies.  The Court does not know what actually happened to the

24   missing evidence, if it ever existed, but concludes that Defendants have failed to show that it was

25   lost in a power surge.

26          In light of the foregoing, the Court concludes that Defendants willfully spoliated evidence.

27   The Court further finds that the extraordinary measures Batterman undertook to mislead opposing

28   counsel and the Court merit a finding of bad faith.

United States District Court
Northern District of California

18

United States District Court
Northern District of California

C.      **Warranted Sanctions**

1.      **Default Judgment**

Once a court finds that evidence has been destroyed, it must determine whether sanctions are appropriate.  InternMatch seeks a terminating sanction, i.e., the entry of default judgment, against Defendants or, in the alternative, an adverse inference jury instruction and the exclusion of certain evidence.

Courts in this circuit apply a five-factor test to determine whether a terminating sanction is warranted.  See Leon, 464 F.3d at 958 (identifying (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions).  The court need not make explicit findings regarding each of these factors, but must make a finding of "willfulness, fault, or bad faith" for dismissal to be proper. Id.

The first two factors weigh in favor of a default judgment.  Computer Task Grp., Inc. v. Brotby, 364 F.3d 1112, 1115 (9th Cir. 2004).  The public and the Court have a strong interest in judicial efficiency and the prompt resolution of cases.  Defendants' willful spoliation of evidence and the resulting need to resolve the instant motion for sanctions weigh in favor of default judgment.  The fourth factor – the public policy in favor of deciding cases on the merits – weighs against a terminating sanction.  Id.  However, the fourth factor alone does not outweigh the others when determining terminating sanctions.  See Rio Properties, Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1022 (9th Cir. 2002) ("While the public policy favoring disposition of cases on their merits weighs against default judgment, that single factor is not enough to preclude imposition of this sanction when the other four factors weigh in its favor.").

The third factor looks at the risk of prejudice.  Prejudice to the moving party exists if the non-moving party's discovery abuses "impair the [moving party's] ability to go to trial or threaten to interfere with the rightful decision of the case."  In re Phenylpropanolamine (PPA) Prods. Liab. Litig., 460 F.3d 1217, 1227 (9th Cir. 2006).

As a result of the spoliation, InternMatch is unable to verify the genuineness of

Nxtbigthing's evidence of use documents.  InternMatch argues that this is the only documentary

proof of Defendant's use of the INTERNMATCH mark pre-dating InternMatch's use.  ECF No.

63 at 11–12.  Without access to the electronic versions of these documents, InternMatch cannot

determine the date the files were created, the history of the modifications made to the files, and

other relevant information.  InternMatch is unable to test their claim that the documents were

"concocted by Mr. Batterman on behalf of Nxtbigthing" without these electronic files.  See ECF

No. 1 ¶ 30.  Defendants' spoliation has prejudiced InternMatch by impairing its ability to attack

Defendants' claims of prior use at trial.  See Leon, 464 F.3d at 960 (concluding that district court

did not err in finding prejudice where one party deleted files that were obviously relevant to the

litigation).

Finally, the fifth factor looks at the availability of less drastic sanctions.  To evaluate this

factor, the Court examines: "(1) whether the district court explicitly discussed the feasibility of

less drastic sanctions and explained why such alternate sanctions would be inappropriate; (2)

whether the district court implemented alternative sanctions before ordering dismissal; and (3)

whether the district court warned the party of the possibility of dismissal before ordering

dismissal."[13]  Anheuser-Busch, Inc. v. Nat. Beverage Distributors, 69 F.3d 337, 352 (9th Cir.

1995).  InternMatch argues that a terminating sanction is the only appropriate one, "both for its

deterrent effect and to remedy the prejudice inflicted on [InternMatch] and on the court." ECF No.

63 at 26 (quoting Atl. Recording Corp. v. Howell, No. CV-06-02076-PHX-NVW, 2008 WL

4080008, at *3 (D. Ariz. Aug. 29, 2008)).

In Howell, recording companies accused the defendant of copyright infringement for

downloading their sound recordings and distributing them to other users.  Id. at *1.  Initially, the

defendant did not cooperate with the plaintiffs' requests to conduct a forensic examination of his

computer hard drive and the backups he allegedly created.  Id.  The defendant removed the

---

[13] The second and third considerations are inapplicable here because Defendants spoliated evidence before the Court had an opportunity to compel discovery or otherwise order "lesser sanctions" and before the Court had any opportunity to warn Defendants.  See Leon, 464 F.3d at 960.

United States District Court
Northern District of California

program and the contents on his shared folder after receiving notice of the lawsuit.  Id.  He

untruthfully testified that he created backups of his shared folder although the creation dates

suggest that the "backups" were created later.  Id.  The defendant also reinstalled his computer's

operating system and installed a program to permanently delete all traces of certain files on his

computer.  Id. at *2.  Ultimately, the district court found that terminating sanctions were warranted

because the defendant repeatedly destroyed evidence central to the factual allegations in the case.

Id.  The court stressed that the defendant testified to facts that could not be disproved because he

destroyed relevant evidence.  Id.  The "timing and character" of the defendant's actions show that

they were deliberately calculated to conceal the truth and that he willfully destroyed evidence to

deceive the court."  Id.  The court concluded without the evidence, the recording companies and

the court could not examine the factual accuracy of the defendant's defenses and "made it

impossible to decide the case on the merits."  Id.  Imposition of a default judgment was

appropriate because "[o]ne who anticipates that compliance with discovery rules, and the resulting

production of damning evidence, will produce an adverse judgment, will not likely be deterred

from destroying that decisive evidence by any sanction less than the adverse judgment he (or she)

is tempted to thus evade."  Id. at *3 (quoting Computer Assoc. Int'l v. Am. Fundware, Inc., 133

F.R.D. 166, 170 (D. Colo. 1990).

Howell lends some weight to InternMatch's request for terminating sanctions.  Unlike in

Howell, however, the Court can still resolve this case on the merits.  InternMatch seeks

declaratory relief "because it is the true owner of the INTERNMATCH trademark and its rights

are prior to and supersede the rights that Defendants assert in the mark."  ECF No. 1 ¶ 7.  A

federal registration is "prima facie evidence of the validity of the registered trademark."  15 U.S.C.

§ 1057.  InternMatch, as the party claiming ownership, must establish that it was "the first to

actually use the mark in the sale of goods or services."  Sengoku Works Ltd. v. RMC Int'l, Ltd.,

96 F.3d 1217, 1219 (9th Cir.) as modified, 97 F.3d 1460 (9th Cir. 1996).  After the imposition of

appropriate evidentiary sanctions, InternMatch will be able argue prior use, and any prejudice to it

will be largely if not entirely cured.

The Court concludes that sanctions short of entry of default are appropriate.  See In re

1    <u>Napster</u>, 462 F. Supp. 2d at 1077.

2                        **2.    Evidentiary Sanctions**

3          InternMatch's alternative request is that, in the alternative, the Court give an adverse

4    inference jury instruction, informing the jury that (1) Defendants destroyed evidence in bad faith

5    and (2) the evidence Defendants destroyed and/or failed to preserve would have been favorable to

6    InternMatch.

7          "[A] party seeking an adverse inference instruction based on the destruction of evidence

8    must establish (1) that the party having control over the evidence had an obligation to preserve it

9    at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and

10   (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable

11   trier of fact could find that it would support that claim or defense."  <u>In re Napster</u>, 462 F. Supp. 2d

12   at 1078 (quoting <u>Hamilton v. Signature Flight Support Corp.</u>, No. C 05-0490, 2005 WL 3481423,

13   at *3 (N.D. Cal. Dec. 20, 2005)).

14         As discussed above, the evidence before the Court satisfies these criteria.  Defendants

15   willfully failed to preserve relevant evidence of use documents that they had a duty to preserve.

16   InternMatch is entitled to an adverse inference instruction.  The precise wording of the instruction

17   will be determined at trial.[14]

18   _____

19   [14] Without now deciding the appropriate wording of the instruction, the Court notes that Judge
     Grewal recently ordered that the following adverse inference instruction be given in another
20   spoliation case in this district:

21              Samsung has failed to prevent the destruction of relevant evidence
                for Apple's use in this litigation.  This is known as the "spoliation of
22              evidence."  I instruct you, as a matter of law, that Samsung failed to
                preserve evidence after its duty to preserve arose.  This failure
23              resulted from its failure to perform its discovery obligations.  You
                also may presume that Apple has met its burden of proving the
24              following two elements by a preponderance of the evidence: *first,*
                that *relevant* evidence was destroyed after the duty to preserve
25              arose.  Evidence is relevant if it would have clarified a fact at issue
                in the trial and otherwise would naturally have been introduced into
26              evidence; and *second,* the lost evidence was favorable to Apple.
                Whether this finding is important to you in reaching a verdict in this
27              case is for you to decide.  You may choose to find it determinative,
                somewhat determinative, or not at all determinative in reaching your
28              verdict.

United States District Court
Northern District of California

1   Additionally, Defendants are precluded from offering argument and testimony that the

2   destroyed evidence, or any versions of it in hard copy or otherwise, supports Defendants'

3   assertions that they have priority to the trademark.  To permit otherwise would unfairly prejudice

4   InternMatch.  See id. at 1077.

5   ### 3.   Attorneys' Fees

6   Under its inherent powers, "a district court may also award sanctions in the form of

7   attorneys' fees against a party or counsel who acts 'in bad faith, vexatiously, wantonly, or for

8   oppressive reasons.'"  Leon, 464 F.3d at 961 (quoting Primus Auto. Fin. Servs., Inc. v. Batarse,

9   115 F.3d 644, 648 (9th Cir. 1997).  The court must make an express finding that the sanctioned

10  party's behavior "constituted or was tantamount to bad faith."  Id. (quoting Primus Auto, 115 F.3d

11  at 648.

12  The Court finds that monetary sanctions are warranted here.  As a result of Defendants'

13  bad faith conduct, InternMatch was forced to spend substantial resources investigating

14  Defendants' spoliation.  Accordingly, InternMatch is entitled to the attorneys' fees associated with

15  bringing the Motion for Terminating Sanctions.  Within 30 days of this Order, InternMatch is

16  ordered to submit a request for a specific amount of fees, with evidentiary support, for the Court's

17  consideration.  The Court will determine a reasonable award "in light of the degree of

18  [Defendants'] culpability."  In re Napster, 462 F. Supp. 2d at 1078.  If Defendants object to the

19  reasonableness of the fees claimed, they may submit an opposition within 15 days of

20  InternMatch's request.[15]  If Defendants file an opposition, InternMatch may file a reply within

21  seven days.

22  The Court declines to award attorneys' fees, under 15 U.S.C. § 1117, incurred in the

23  litigation as a whole.

24  / / /

25  / / /

26

27  Apple Inc. v. Samsung Elecs. Co., 881 F. Supp. 2d 1132, 1151 (N.D. Cal. 2012).

28  [15] Given Nxtbigthing's filing history, the Court reminds it that the Court may choose to disregard an untimely opposition.

United States District Court
Northern District of California

1

## CONCLUSION

2      For the reasons stated above, the Court hereby denies InternMatch's Motion to the extent

3  InternMatch seeks default sanctions, and grants InternMatch's Motion to the extent InternMatch

4  seeks a preclusion order, an adverse inference instruction, and attorneys' fees.

5      IT IS SO ORDERED.

6  Dated: February 8, 2016

7

8  _____
                                    JON S. TIGAR
9                          United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California